on Satco Products v. Thread Group. Mr. Weiss, whenever you're ready. Yes. Philip Weiss of Weiss & Weiss on behalf of Satco Products, Inc. Appellant. May it please the Court. Please proceed. Thank you. There are several issues in this case. One of the main issues is the date of first use for Thread Group's Threadmark. They've listed the date of first use as July 15, 2014, which cannot be the correct date. Thread Group verified this as their date of first use and provided interoperatory answers. They've only stated that it could be any other date in their trial brief. Applicant is required to set forth their actual date of first use. They are charged with knowing what signing and failing to make appropriate inquiry is reckless disregard for the truth, citing standard knitting limited. Thread Group chose a date of first use knowing it could not be the first date of first use. What about the insurance extension request? Okay. The issue there is two parts to that. One part is they first asserted this new insurance request in the trial brief. They've always stated that the July 15, 2014 date was the date of first use. Under Levi-Strauss, you cannot present a new date in the trial brief. The ITUF cannot. That's number one. Number two, well, also Levi-Strauss. Okay. Under 37 CFR 2.173, a registration owner must submit verified request specifying amendment and if it's involved in the inter-parties proceeding for the TTAB, a motion must be filed. Thread Group never filed a motion and they raised this argument in their trial brief. That's number one. Number two, in response to your question, the original applications were owned by Google, not Thread Group. Under 1060, you cannot assign a ITU application until it's been registered. Here in this particular case, they filed the statement of use in October with the insurance. In December of that year, they filed the assignment to assign the mark from Google to Thread Group. In doing so, you cannot now say extend it to May where it would again if you extend it to May, it's an application, not a registered mark. If you assign that ITU past that date, you violate 1060 and Section 10 of the Lanham Act. Well, Mr. Weiss, this is Judge Prost. Just going back before we get to that second point you were talking about, the White Papers were available in mid-July 2015. That was even before any insurance extension comes into play. If that's so, why aren't the White Papers, which were available to the public on the website in mid-July 2015, sufficient to show use during the relevant period? Because the White Papers are purely for promotion. First of all, what you have to assume is that this was an educational tool, which I don't agree with, and it's in the papers, that the computer services, namely providing an internet site, featuring technology, facilitating wired and wireless communication among electronic and computer devices. But even putting this as an education tool, this is purely for the benefit of Thread Group. There is no argument that the education with regards to Thread Group is beneficial to the public. It makes no sense whatsoever. What about the fact that it was available on the website and was downloaded 200 times? It was not downloaded 200 times. It may have been downloaded 200 times by the original members. So here's the question. What was and was it usable? And the question there is, what you're talking about is the specification. The specification which was actually sold with the product, with specification 1.1.1, that was the one that was actually submitted with the Erickson trial testimony. What date do you think it was first used in Congress? February. I'll give you the exact date. Hold on. It's February 2017. I can give you the, let me see if I can get you the exact date. Can I follow up on Judge O'Malley's previous question, which is, if it was on the website, why was it not available to the public? Wait. What part are you saying was on the website? You're talking about? The white papers available mid-July 2015. Right. The white papers were only promotional, was only for promotion. If you look at the deposition testimony of Ms. Neidig and Mr. Kamlani, they both stated that the website was a promotional tool and they admitted that Thread Group did not render services on the website. Okay. But even assuming that there were white papers, the white papers, all they were was discussing Thread Group and what Thread Group could do in the future. According to 15 U.S.C. 1127, you have to render services for the benefit of another. Can I just make sure I understand your position? Your position, I think, is that because the white paper didn't have a complete protocol and was more of a promotional nature, talking about what was going to be happening in the future, that cannot be considered something that's featuring technology, facilitating wired and wireless communication among electronic and computer devices? Is that your position? Yes. And also, it wasn't for the benefit of others. The question is... When you say it wasn't for the benefit of others, you're saying that because only the members of the Thread Group saw this website, that can't constitute a use in commerce? Is that what you're saying? No. My question there is, from what I understand, the services have to be... You have to be providing services outside of Thread Group, outside of the seven original members. And here, you're not providing... Why is that? Because that's under ACOC, under Lions. I mean, Lions says you can't publish for future plans, not use in commerce. I mean, there was no service being provided prior to February 2017. I mean, for Thread Group to say, here's what Thread Group is about, is not a service to anyone in the public. I mean, that's a service for Thread Group. That's basically... You're extolling the virtues of Thread Group and what it's going to provide in the future. To me, that's not a service. Who is the trademark holder here? Originally, it was Google, and then they assigned the rights once the application registered to Thread Group. Okay. Are you saying that nothing before February 2017? I mean, even if you didn't go all the way back to July 13th, 2015, in October 2015, you've got white papers. In January of 2016, there's version 1.01. And then in July 2016, there's 1.10. I don't know why you jump all the way to the final version before you think anything's useful. Because no product was sold with those other versions. There was no service. It has to be a service, and there was no service because there were no goods being sold. The first time any good was sold in association with the specification was February 2017. That's unequivocal. And so, these other ones were just drafts. And even the one in July 2015 was a draft that went to the other members to comment on, which wasn't then available. That was only internal, the July 2015. It wasn't given... Go ahead. What about the board's reliance on, you know, that there doesn't have to be a sale? You know, even non-profits are entitled to registration of trademarks. Right. But again, I understand about the sale, but these were all just drafts. They had no relation to any goods being sold in the future. These were all for goods and services to be provided in the future. And there was nothing being sold or any services being provided before February 2017. So, your view is that even if there's something that's, you know, a mark that's being used to advertise something that's being developed, it never can be registered until the ultimate product is developed and sold? Well, according to Coutre v. Platum held that the cancellation of a mark where no services were rendered despite website services being offered, the mark was canceled. But don't you think we need to look at what the service is that's being described in the use of the mark and the registration? Isn't that what's critically important here? I mean, what the service is, is providing the website. Well, that's what was found by the CTAB. I don't believe in reading what the actual service is. Going back to what we were stating, in what Dr. Pepper held, the promotional activities for one's own business are not services within the meaning of the act. Ordinary or routine promotional activities of one's own service. And then Allard Enterprises v. Advanced Programming Resources states, use in commerce requires a genuine commercial transaction. So, that addresses what we were discussing before. I just wanted to get to one more thing unless you guys have questions. Hearing none, go ahead. Okay. So, the second part besides, oh, so I think no matter what, the date that was stated in July 2014 just falls. Okay. Their membership didn't even open until October 2014. So, I think that alone should discredit that. There is no other date being put forth. Even the CTAB stated, you know, there is a date somewhere between then and the insurance, but there was no date provided and the appellees did not provide one. Now, on the other count is the implied license. That's the other part I wanted to get to quickly. There shouldn't be no implied license here. Google did not control Thread Group. Thread Group made several arguments that Google's on the board, so therefore, they had control of the website. That's totally untrue. Under the bylaws, et cetera, each board member had one of seven votes. So, no one member could control what was being done on the website, marketing, et cetera. And here specifically, I mean, Nest was the board member, but assuming that, you know, the vote of Nest transferred to Google, Google had only one of seven votes, and therefore, they could not control or had no control over what was on the website. It was Thread Group's website. Google had no control of it, and therefore, Thread Group's use did not ignore it to the benefit of Google, and therefore, any use that was done does not apply here. Okay. Should I keep going? I don't want to lose my reply. I think you're almost there, so why don't we hear from, why don't we turn to Mr. Coleman? Okay. Hello, Your Honors. May it please the Court. My name is Nick Coleman for Thread Group, Inc. Be happy to be here. I think as an initial matter, to the best of our knowledge, non-use has not explicitly been designated by this Court as a question of law or fact, but the question of abandonment has been determined to be a question of fact. We view it under the substantial evidence standard. We submit that the same standard should apply here given that the evaluation is the same in terms of determining whether the relevant party's actions constitute use in commerce at the relevant time, but the only difference being whether or not there was previous use in the case of abandonment or no previous use in the context of non-use. With that in mind, unless the Court has any specific questions, I believe there are three cases. The first this Court began addressing earlier is, did the Board correctly determine the scope of services of the 626 registration and determine that Thread Group's actions did fall within that scope? The Board looked at a number of definitions presented by both parties. We submit that the most important of those is the definition of the word feature, which is where the Board was able to come to its conclusion about what the proper scope of those services is. The definition of record, which was not objected to by FATCO, included that featuring may mean to outline, to depict, to delineate the main characteristics of, or to give prominence to. So if the Board could properly find that Thread Group's actions were providing an Internet site, outlining technology, facilitating wireless communication, depicting that technology, delineating the main characteristics of that technology, or giving prominence to that technology, then the Board could accurately say that Thread Group's actions do fall within the scope of the properly construed services of the 626 registration. One of the things that FATCO has been trying to argue is that these actions by Thread Group were purely promotional in nature, but it's important to understand the nature of the Thread Group to understand what that really means. Because the Thread Group is a membership organization, and as FATCO admitted, Thread Group does not provide any goods themselves. Rather, Thread Group's member companies are the entities that provide goods. The informational and advocacy services that the Board found that were part of the content of the Thread Group website were for the benefit of others. The Board specifically noted that the Thread Group website promoted public awareness of the Thread protocol and technology, educated the public on capabilities, benefits, and uses of the Thread technology, educated the public on the integration and interoperability of third-party products that use the technology. And perhaps most importantly, as we noted, since it's the Thread Group member companies that provide the goods that incorporate the Thread technology, the Thread Group's actions raised awareness and therefore created a market for those member company products. So very clearly, those services are for others, namely for the public at large, and for the member companies to create a market for their products. Counsel, I understood the opposing counsel to be saying that the only members of Thread Group were able to see the website. The public wasn't able to see it. So could you explain a little bit more your position that it was for the benefit of the public, like in response to the argument made earlier in this argument by your opposing counsel? Sure, Your Honor. The original website is a record here at appendix pages 941 to 952. It was completely available to the public, and Your Honors can look at the content of that website and see it on its face provided those services because it did give prominence to the Thread technology. It did delineate the main characteristics of the Thread technology. It did depict and outline the Thread technology. So it specifically did constitute those services. I believe what counsel for Satco is trying to allege is that there were certain aspects of the website that were available only to certain points in time. Some of the documents that were and up to a point that's still well within the Embarcadero period, the Thread specification was originally only available to members as well. But again, during the Embarcadero period did become available to the public as well. So it's not clear to me exactly what content that did constitute the services of the 626 registration wasn't available to the public. It was a publicly accessible website. Moving on to the second point is that this course should determine whether or not the Board correctly determined that the deadline for filing the Statement of Use as Extended, namely May of 2016, was the correct date by which Satco bore the burden of proving non-use. The Board's decision was pretty straightforward. It based the decision on its own Embarcadero case, which very clearly outlines the reasoning behind in the context of a non-use case, giving that insurance extension availability as well. And that's important for a couple of reasons. First of all, because Satco did not show non-use through the entire Embarcadero period. But secondly, it provides a very clear way for this court to resolve all issues. As the court noted, there was an assignment from Google to Thread Group in December of 2015. And therefore, from December of 2015 through May of 2016, Thread Group was both the owner and the user of the mark. So any sort of analysis related to whether or not Thread Group's use in order to Google's benefit in that time period is irrelevant because there was no need for Thread Group's use to in order to any other party's benefit. Of course, the Board did look into that and did find that, yes, there was adequate use by Thread Group inuring to Google's benefit by way of that implied license. I think it's important maybe to recognize why that question of an implied license was important in the first place. And that's because the Lanham Act specifically defines a related company as any person whose use of a mark is controlled by the owner with respect to the nature and quality of goods or services and notes that use by a related company does in order to the benefit of the registrant or the applicant. So if there was this implied license, if Google did have sufficient control over Thread Group's actions, then yes, Thread Group's service, excuse me, services provided in association with the website did in order to Google's benefit. The Board specifically found a number of ways in which that was the case, specifically noting that Nest and then Google via its acquisition of Nest was a founding member of the JFA, which was the precursor to the Thread Group, and eventually was a sponsor-level Board member of the Thread Group. Google always provided the president of the Thread Group. Google as a Board member of the Thread Group approved all website content and that Google had constant input, control, and oversight of the website. Now, as we noted before, this is something to be evaluated under the substantial evidence standard. We would submit that the evidence and record definitely supports the Board's conclusion and especially the factors specifically stated by the Board. But beyond those, there's quite a bit of additional evidence that its own vice president, Vince Cerf, as both an advisor and contributor to the Thread Group website, that Google kept internal tabs of Thread Group activities. Mr. Grant Erickson testified that prior to his becoming president of the Thread Group, while he was only a Google employee, he received internal updates as to Thread Group's activities. In addition, there's evidence that Thread Group's trademark counsel throughout the prosecution of these relevant applications, importantly, including at the time of filing the statement of use, Thread Group provided to Google's trademark counsel an example, a specimen, of the website at that time, giving Google every opportunity to inspect exactly those services provided on that website. There was no indication that Google had any sort of issues with that. So, again, the reason this is important is because the question to be determined is, was there sufficient quality control over the nature and quality of the services offered by Thread Group? This court and other courts have noted a number of factors that go towards that determination, including the close working relationship between the parties, reasonable reliance on party standards and procedures to ensure consistent quality, and any evidence of actual decline in quality. All of those points that we noted that the board specifically noted and that are also of evidence outside of the board's specific statements go to that close working relationship between the parties. But the other factors also lay in favor of there being sufficient control. For example, reasonable reliance on party standards and procedures. As Satco has noted, it was the Thread Group Board of Directors who ultimately controlled the nature and the content of the website. That Board of Directors is made up of representatives of the various member companies of the Thread Group. And as we noted, the Thread Group's activities in association with this website directly benefit each of those member companies because they create a market for those member companies' products that will incorporate the Threadmark by creating that market awareness. So, Google could easily and reasonably rely on each of the board members to maintain a high quality of services associated with the website because it directly benefited each of those member companies. In addition, there's no evidence of record that there is any actual decline in quality of the services associated with the website. And in fact, Ms. Neidig, who was the multiple points in her testimony, that the content of the website remained generally consistent throughout the lifespan of the website. And that can be seen in the two different examples of the website of record that each of those examples do all of those featuring aspects. They give prominence to Thread. They delineate the main characteristics of Thread. They depict Thread and they outline Thread technology. Now, another thing that SACCO has tried to make an issue about is, was the board correct in determining this parent subsidiary relationship between Google and Nest? I would suggest, first of all, that that is only one factor in the overall close working relationship between Google and Thread Group, which are the two parties that the analysis really should concentrate on. But regardless of whether Google and Nest were parent subsidiary or peer companies, as SACCO has alleged, the Thread Groups bylaws itself define an affiliate as including both of those conditions, both parent subs and peer companies under common control. And the reason that's important is because the bylaws also define a member and its affiliates as a single member of Thread Group. So, regardless of SACCO's arguments regarding the relationship between Google and Nest, by Thread Group's own bylaws, Google is a member of the Thread Group. That's supported by direct testimony from Mr. Erickson, who testified that he represented Google in his role as president of Thread Group, by Mr. Kamalani, who stated that Google is a member of the board of directors, and Ms. Neidig, who testified that Google is a member of Thread Group. So, we suggest that while the evidence of record does support the board's conclusion that Google was a parent of Nest, by way of testimony from Mr. Erickson, Ms. Neidig, Mr. Kamalani, and Ms. Rucy Kelly, all stating that at separate times that Google acquired Nest and Google owns Nest, that while that does support the board's conclusion that Google was the parent company of Nest, it's really not determinative of the ultimate decision of whether Thread Group's actions with respect to the website in order to Google's benefit. One final issue, as I know I'm getting close to time, is that SACCO's counsel tries to allege that Thread Group is attempting to allege a new date of first use, or change the date of first use that was stated on the Statement of Use. That's not what's happening here. What Thread Group has done is said that in the context of a non-use claim for an intent-to-use application, the board has explicitly stated that the deadline for filing the Statement of Use is the date by which the challenger bears the burden of proving that non-use. We're not explicitly saying anything about changing the dates of first use, and in fact, we maintain that that original website did include all of those facilitating actions with respect to, excuse me, featuring actions with respect to the informational and advocacy services. But regardless, that's not the important date in terms of deciding whether or not there was non-use here. In the context of non-use, it's the deadline for filing the Statement of Use as extended that SACCO bore the burden of proving. Perfect timing. Thank you. If the board has any other questions, I'd be glad to answer them. Of course, not to worry. But Mr. Weiss. Okay. So I want to address the arguments that were just made by Mr. Coleman. First of all, he made an argument that with regards to what the services provided that Thread Group is a application. First, it was filed by Nest, which was intended on an ecosystem for first and third party products working together. Second, that was then assigned to Google, okay, who's an actual company, not a membership organization. So when looking at what the services are, you don't look to what that Thread Group was a membership organization. You have to look to what Nest and Google were because they were the ones who filed, you know, Nest filed the application to Google and took it over. That's number one. Number two, again, going back to the deadline extended, there's no doubt that July 15, 2014 date is not a date of first use. The membership was not open until October 2014. They didn't provide a service and they didn't provide any service for the benefit of another. So that July 15, 2014 date goes out the window. The only issue there is they then in the first time in their trial brief said, oh, if that date doesn't work, let's extend it to May. Again, not even saying what date it would have been. The issue there again is the law specifically states that under 37 CFR 2.173, the registration owner must submit a verified request specifying the amendment and if it's involved in inter-party proceedings for the TTAB, a motion must be filed. No such motion was filed. So if Mr. Coleman wants to rely on the, you know, on that first date, that first date, there is no, you know, we've submitted more than sufficient and substantial evidence to show that first date doesn't work. If he, the second part is he didn't file anything to amend that date. Okay. And then his last argument about Google providing Mr. Cerf, even if he's an advisor, he had no control of the website. So that, sorry, unless you have any questions. Oh, can I finish my thought? Yes. Thank you. What I was saying there is Mr. Cerf at best according to Mr. Coleman was an advisor and he had no control of the website. Thank you. Thank you. We thank both sides and the case is submitted. That concludes our proceeding for this morning. Thank you very much. The honorable court is adjourned from day today.